**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| ELECTROSTIM MEDICAL SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CENTERS FOR MEDICARE AND MEDICAID SERVICES; and QLARANT INTEGRITY SOLUTIONS, INC.,<br><br>Defendants. | Case No. ___ |

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

Plaintiff Electrostim Medical Services, Inc. ("EMSI" or "the Company"), brings this action against Defendants Centers for Medicare and Medicaid Services ("CMS" or the "Agency") and Qlarant Integrity Solutions, Inc. ("Qlarant" or the "Contractor"). This action is brought pursuant to the United States Constitution, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Mandamus Act, 28 U.S.C. § 1361.

A Time-Sensitive Motion for a Preliminary Injunction and a Time-Sensitive Motion to Seal have been filed contemporaneously with this Complaint.

## INTRODUCTION

1. This case presents an extraordinary violation of Plaintiff EMSI's rights.

2. In mid-August, Plaintiff EMSI was suspended, without notice, from receiving Medicare payments by Defendant Qlarant, a private contractor acting on

behalf of Defendant CMS. The suspension is a pretense to avoid paying EMSI for equipment it has already delivered and continues to deliver.

3. Qlarant's suspension letter indicated that EMSI was being suspended based on "credible allegations of fraud," purporting that EMSI failed to deliver certain medical equipment and had a "pattern" of billing for equipment that was not medically necessary.

4. Both of these grounds were obviously, demonstrably false. In its rebuttal to Qlarant's allegations, EMSI literally attached proof-of-delivery and acknowledgment forms signed by the recipient patients. As to the alleged "pattern" regarding medical necessity, EMSI provided detailed medical summaries and also pointed to numerous audits and appeals showing that EMSI's billing practices were valid and appropriate.

5. Put simply, EMSI proved—with documents—that the specified "credible allegations of fraud" were neither credible nor even remotely fraudulent.

6. Qlarant's four-page response ignored EMSI's proof, and conclusorily alleged that there were other purported allegations supporting the suspension. In the weeks that followed, EMSI furnished additional information and repeatedly asked Qlarant and CMS for any information about the unspecified allegations. Each time, the Defendants declined, leaving EMSI with no way to meaningfully address the claims.

7. The end result is that EMSI's property has been taken on the basis of undisputed falsehoods and secret allegations without any meaningful process. Indeed,

EMSI's property is *still* being taken because the Company continues to serve its Medicare patients while it is being denied reimbursement.

8. Such government action is repugnant to both the Constitution and basic administrative law principles. It offends the Constitution by depriving a private company of its property without due process of law, and it represents the kind of arbitrary, capricious, and unlawful government action that administrative law prohibits.

9. The consequences of these illegal acts could not be graver for EMSI. In a matter of weeks, the suspension of Medicare payments has cost the Company hundreds of thousands of dollars in revenues. As a result, the Company has been forced to either furlough or reduce time for more than a third of its workforce and, more recently, lay off some furloughed employees. If the suspension persists, EMSI will be forced into a bankruptcy, an irreversible injury that will cripple, if not destroy, the Company.

10. EMSI recognizes that injunctive and mandamus relief are extraordinary remedies. But this is an extraordinary situation. A private contractor incentivized to withhold payments is doing so—and can continue to do so for months—on the basis of allegations that are either provably false or secret. The sole administrative "remedy" afforded to EMSI was illusory and futile. Defendants, having ignored the disproven claims, are continuing to claim "fraud"—and withholding EMSI's past, present, and future payments—because EMSI's rebuttal did not rebut *undisclosed information*. In

such circumstances, judicial intervention is warranted to ensure that Defendants carry out their constitutionally mandated and non-discretionary duty to end the suspension.

## PARTIES

11. Plaintiff Electrostim Medical Services, Inc., is a Florida corporation with its principal place of business at 3504 Cragmont Dr., Suite 100, Tampa, FL 33619.

12. Defendant CMS is an agency of the United States Government within the Department of Health and Human Services. CMS is an agency under the definition provided in the Administrative Procedure Act. 5 U.S.C. § 551(1). CMS is responsible for the administration and operation of the Medicare program, including reimbursements and suspensions. CMS is headquartered at 7500 Security Blvd., Baltimore, MD 21244.

13. Defendant Qlarant is a limited liability company organized under the law of Maryland, with its principal place of business located at 28464 Marlboro Ave., Easton, MD 21601. Qlarant serves as a Unified Program Integrity Contractor ("UPIC") for CMS, including as to Medicare reimbursement and suspensions. As is explained below, Qlarant served as the UPIC for the events described in this Complaint.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and § 1361 (mandamus jurisdiction).

15. Venue is proper in this judicial district as the Plaintiff, EMSI, resides in this district and a substantial part of the events giving rise to the claims occurred within this district. *See* 28 U.S.C. § 1391(b)(2).

## ATTACHMENTS

16. There are several attachments to this Complaint, which should be considered to be part of this pleading:

a. **Exhibit A:** A declaration, dated October 20, 2026, by Mario Garcia, Jr., Chairman and Founder of Plaintiff EMSI ("Decl. of M. Garcia Jr.").

b. **Exhibit B**: A declaration, dated October 20, 2026, by Gretchen Dacey-Zavalianos, Executive Vice President of Operations for Plaintiff EMSI ("Decl. of G. Dacey-Zavalianos").

c. **Exhibit C**: A declaration, dated October 20, 2026, by Marisa R. Dorough, Counsel for Plaintiff EMSI.

d. **Exhibit D**: A letter, dated August 21, 2026, from Defendant Qlarant, operating as an agent and under the instructions of Defendant CMS, notifying Plaintiff EMSI that as of August 13,

2026, CMS had suspended EMSI from receiving Medicare payments (the "Notice").

e. **Exhibit E**: A rebuttal statement regarding the Notice, dated August 31, 2026, and submitted pursuant to 42 C.F.R. § 405.372(b), from Plaintiff EMSI to Defendant Qlarant, which was operating as an agent and under the instructions of Defendant CMS (the "Rebuttal").

f. **Exhibit F**: A letter, dated September 2, 2026, from Defendant Qlarant, operating as an agent and under the instructions of Defendant CMS, notifying Plaintiff EMSI that it received the Rebuttal (Ex. E) on September 1, 2026.

g. **Exhibit G**: A letter, dated September 17, 2026, from Defendant Qlarant, operating as an agent and under the instructions of Defendant CMS, responding to Plaintiff EMSI's Rebuttal (Ex. E) ("Response").

h. **Exhibit H**: An email, dated September 23, 2026, from a Qlarant email account (ProviderSuspensionSW@qlarant.com) to Stephen Azia and Jennifer Summa (counsel and representative for Plaintiff).

i. **Exhibit I**: An email, dated September 29, 2026, from a Qlarant email account (ProviderSuspensionSW@qlarant.com) to Stephen

Azia and Jennifer Summa (counsel and representative for Plaintiff).

j. **Exhibit J**: A letter and its attachments, dated October 1, 2026, from Stephen Azia (counsel for Plaintiff) to Qlarant.

k. **Exhibit K**: A letter and its attachments, dated October 5, 2026, from Stephen Azia (counsel for Plaintiff) to Qlarant.

l. **Exhibit L**: A letter from Qlarant, dated October 6, 2026, to EMSI.

m. **Exhibit M**: A letter from Qlarant, dated October 16, 2026, to EMSI.

17. The Notice- and Rebuttal-related documents, as well as the Declarations of Mario Garcia, Jr., and Gretchen Dacey-Zavalianos, have been filed with redactions to protect private patient information and sensitive financial information. A Motion to Seal accompanies this Complaint.

## FACTS

### I. Plaintiff EMSI and its Successful Business

18. Plaintiff EMSI is a Florida success story.

19. Mario Garcia, Jr., a longtime Tampa resident, founded the Company in 1995 as a small start-up business. *See* Decl. of M. Garcia Jr., ¶¶ 5-6.

20. Though it remains family owned, EMSI's focus on delivering quality pain management and post-surgical rehabilitation products and services has helped it grow into a national electrotherapy and orthotic manufacturer and supplier. *See* Decl.

of M. Garcia Jr., ¶¶ 8–10; Decl. of G. Dacey-Zavalianos, ¶ 6.[1] Through the efforts of its employees, EMSI has built a strong reputation with patients and medical providers. *See* Decl. of M. Garcia Jr., ¶ 10.

21. Today, the Company services over 50,000 patients—including around 8,000 monthly Medicare patients—and, until the suspension took effect, employed nearly 270 people, mostly in the Tampa area. *See* Decl. of M. Garcia Jr., ¶¶ 11–12; Decl. of G. Dacey-Zavalianos, ¶ 18.

22. EMSI's products consist of devices, garments, and braces that assist patients with post-surgery recovery and pain management. *See* Decl. of M. Garcia Jr., ¶ 8; Decl. of G. Dacey-Zavalianos, ¶¶ 6, 8. In particular, EMSI supplies electrotherapy equipment that helps stimulate patients' muscles after surgery. *See* Decl. of M. Garcia Jr., ¶ 8; Decl. of G. Dacey-Zavalianos, ¶¶ 6–7. This kind of therapy is well-established and medically necessary in a host of circumstances, but the challenges of manufacturing and distributing such equipment mean that EMSI is one of only a few companies that can reliably and quickly serve patients nationwide. *See* Decl. of M. Garcia Jr., ¶¶ 13–14; Decl. of G. Dacey-Zavalianos, ¶¶ 19–20.

23. For many of its products, including the ones at issue here, EMSI operates under a "capped rental" model. *See* Decl. of G. Dacey-Zavalianos, ¶ 15. Under that system, EMSI supplies patients with the medically necessary medical equipment and accompanying supplies under a rental plan that eventually leads to the patient owning

[1] Throughout this Complaint, EMSI uses the terms "supplier" and "provider" interchangeably.

the device after 13 months. *See id*. This approach ensures that patients have long-term access to equipment that they will need for their often lengthy and complex recovery periods. *See id*.

**II. The Medicare Program**

24. As with thousands of companies, EMSI participates in the Medicare program. *See* Decl. of M. Garcia Jr., ¶¶ 17–18; Decl. of G. Dacey-Zavalianos, ¶ 14.

25. Medicare is a federal health insurance program run by CMS, and made up of programs that provide medical benefits to the elderly and disabled.

26. Under these various programs, healthcare providers and suppliers like EMSI provide products and services to covered patients and the United States Government pays health care providers on a fee-for-service basis at rates approved by CMS. Thus, providers first submit claims for reimbursement for services, the Government reviews those claims, and then the Government makes appropriate payments to the providers.

27. In the case of EMSI, Medicare Part B covers medically necessary durable medical equipment, prosthetic devices, prosthetics, orthotics, and supplies (often referred to as "DMEPOS"). *See* Ctrs. for Medicare & Medicaid Servs., *Durable Medical Equipment, Prosthetic Devices, Prosthetics, Orthotics, & Supplies*, https://www.cms.gov/medicare/payment/fee-schedules/dmepos (last visited Oct. 7, 2026). Thus, under the terms of Medicare Part B, EMSI supplies Medicare patients with capped rental equipment when such equipment is determined to be medically necessary by a qualified medical professional. *See* Decl. of G. Dacey-Zavalianos, ¶ 15.

EMSI then seeks reimbursement from Medicare for that equipment. *See id.*, ¶¶ 14, 16. EMSI has followed this approach for years. *See id.*, ¶ 14.

28. Both Medicare beneficiaries and suppliers rely heavily on Medicare's programs functioning in a prompt, predictable manner. Beneficiaries receive critical medical products from specialized providers, like EMSI, who are often one of only a handful of companies that make and deliver necessities for key groups of patients. In turn, companies like EMSI have to be sure that they will be reimbursed in a timely, reliable manner so that they can make their products, build their facilities, and pay their staff.

29. Given the importance of the program, Medicare has a host of safeguards. As part of its enrollment as a DMEPOS supplier for Medicare, EMSI was required to follow a thorough accreditation and bonding process, and agree to routine, unannounced site visits to its facility. *See* Decl. of G. Dacey-Zavalianos, ¶ 23; *see also* Ctrs. for Medicare & Medicaid Servs., *Enroll as a DMEPOS Supplier*, https://www.cms.gov/medicare/enrollment-renewal/providers-suppliers/durable-medical-equipment-prosthetics-orthotics-supplies-dmepos (last visited Oct. 7, 2026).

30. In addition, CMS contracts with various private entities (such as Defendant Qlarant) to act as Unified Program Integrity Contractors ("UPICs") with audit responsibilities.

## III. EMSI is a Reliable and Regularly Audited Medicare Supplier

31. Consistent with the arrangements described above, EMSI's requests for reimbursement were potentially subject to pre- or post-payment review by CMS to

determine whether those requests were medically necessary. *See* Decl. of G. Dacey-Zavalianos, ¶ 26. As is explained in greater detail below, EMSI was audited for years through Medicare's Comprehensive Error Rate Testing Program ("CERT"), which found, on initial review, before any appeal by EMSI, that 95% of EMSI's reimbursement claims were accurate. *See infra* at ¶ 79.

32. As is also explained in more detail below, EMSI had a strong track record of challenging claims of overpayment by UPICs. *See infra* at ¶ 80. In 2025, of the 60 EMSI claims that UPICs challenged, 77% were deemed to be appropriately paid and the remainder—which, *in total*, amounted to less than $2,000 of overpayment—are still in the appeals process. *See id.*; Decl. of M. Garcia Jr., ¶ 21.

33. The documentary record—easily accessible to CMS, HHS, and Qlarant—shows that EMSI has a strong record of compliance with Medicare and has met or exceeded the requirements imposed by the program and CMS. *See* Decl. of M. Garcia Jr., ¶¶ 16–21; *see* Decl. of G. Dacey-Zavalianos, ¶¶ 22–26.

**IV. Medicare is a Critical Part of EMSI's Business**

34. Having put in the time, effort, and funds to meet Medicare's requirements, while also delivering high-quality products and dependable services, EMSI now serves a large population of Medicare beneficiaries. *See* Decl. of M. Garcia Jr., ¶¶ 10–12, 17–19; Decl. of G. Dacey-Zavalianos, ¶¶ 13-14, 18, 22.

35. From August 2025 to July 2026, around 19.5% of EMSI's revenues came from Medicare reimbursement payments. *See* Decl. of G. Dacey-Zavalianos, ¶ 36.

Before the events described below, EMSI expected around 19.5% of its 2026 revenues to come from Medicare reimbursement payments. *See id.*

36. Put simply, Medicare reimbursements are a critical aspect of EMSI's business.

37. The Company believed that if it continued to play by the rules and deliver the quality products and services it had for decades, it could rely on the Government to treat it fairly. *See* Decl. of M. Garcia Jr., ¶¶ 16–17. That turned out to be wrong.

**V. EMSI's Sudden Notice of Medicare Payment Suspension**

38. In early August, EMSI stopped receiving Medicare payments. *See* Decl. of G. Dacey-Zavalianos, ¶ 27.

39. The Company contacted CMS to understand what was happening, but was only told that EMSI was being suspended from receiving Medicare payments.

40. On August 21, 2026, Qlarant sent EMSI the Notice informing the Company that a suspension of Medicare payments had taken effect on August 13, 2026. *See generally* Ex. D.

41. The Notice claimed that this suspension was "based on credible allegations of fraud," and cited 42 C.F.R. §§ 405.371(a)(2) and 405.372(a)(4) as the bases for the suspension. Ex. D at 2.

42. The Notice also claimed that prior notice of the suspension had not been provided because such "notice would place additional Medicare funds at risk and hinder CMS' ability to recover any determined overpayment." *Id.* at 2 (citing 42 C.F.R. § 405.372(a)(3)).

43. Upon information and belief, Qlarant has sent other virtually identical form notices to other Medicare suppliers.

44. To understand this Notice, and the harm it has inflicted on EMSI, it is important to describe the context in which such abrupt, unexplained Medicare suspensions occur.

**VI. The Medicare Suspension Regime**

45. Most allegations of Medicare overpayment follow a course that largely tracks standard administrative adjudication procedures. There is an "initial determination" of overpayment by a UPIC, followed by an administrative review process—including multiple appeals—by which a supplier can obtain a final decision from HHS regarding overpayment, with that decision subject to challenge in federal court.

46. This is the normal course for addressing such issues and is a process with which EMSI was well familiar. *See* Decl. of M. Garcia Jr., ¶¶ 20–21; Decl. of G. Dacey-Zavalianos, ¶ 26.

47. EMSI's suspension breaks with this approach.

48. Under the active suspension regulations, "Medicare payments to providers and suppliers . . . may be . . . [i]n cases of suspected fraud, suspended, in whole or in part, by CMS or a Medicare contractor if CMS or the Medicare contractor has consulted with the OIG, and, as appropriate, the Department of Justice, and determined that a credible allegation of fraud exists against a provider or supplier." 42 C.F.R. § 405.371; *see also* 42 C.F.R. § 405.372.

49. A "credible allegation of fraud" is "an allegation from any source, including but not limited to the following:

(1) Fraud hotline tips verified by further evidence.

(2) Claims data mining.

(3) Patterns identified through provider audits, civil false claims cases, and law enforcement investigations."

42 C.F.R. § 405.370(a). The regulations further provide that "[a]llegations are considered to be credible when they have indicia of reliability." *Id.*

50. A suspension can be implemented "without prior notice if CMS, the intermediary, or carrier determines that the Medicare Trust Funds would be harmed by giving prior notice." 42 C.F.R. § 405.372(a)(3).

51. Once a suspension is in place, it remains in place for 180 days, with the possibility of continuing renewals for up to 18 months unless "there is good cause to not continue such certification" and a certification from either the Office of the Inspector General ("OIG") or the Department of Justice that "the matter continues to be under investigation." 42 C.F.R. § 405.371(a)(2), (b)(2)(ii). Even after 18 months have passed, the suspension can be maintained if "[t]he case has been referred to, and is being considered by, the OIG for administrative action" or the Department of Justice submits a written request to continue the suspension. 42 C.F.R. § 405.371(b)(3)(i).

52. Under the regulations, a suspended supplier is permitted to submit a rebuttal to the notice of suspension. *See* 42 C.F.R. §§ 405.372(b)(2), 405.374.

53. Then, "CMS, the intermediary, or carrier must within 15 days, from the date the statement is received, consider the statement (including any pertinent evidence submitted), together with any other material bearing upon the case, and determine whether the facts justify the suspension, offset, or recoupment or, if already initiated, justify the termination of the suspension, offset, or recoupment." 42 C.F.R. § 405.375(a).

54. However, that "determination . . . is not an initial determination and is not appealable." *Id.* § 405.375(c).

55. Thus, without judicial intervention, a suspension can remain in place indefinitely without triggering administrative review procedures.

56. It is important to note that suspension is simply a withholding of payments. A suspended supplier is not precluded from participation in the Medicare program and the supplier's claims continue to be processed and credited to its account. In other words, a supplier can continue to serve Medicare patients and submit claims, but the Government will simply not pay the supplier for those claims until it decides to lift the suspension.

57. In practical terms, these regulations give contractors like Qlarant essentially unchecked power to destroy successful, productive, and compliant suppliers like EMSI.

58. A supplier that has lawfully and reliably supplied critical products for decades can have all Medicare payments, *including for already provided products*, stopped abruptly and without prior notice by a private contractor compensated to find

"allegations of fraud." That suspension can be based on "any source," and the contractor often does not disclose those sources in any meaningful detail. That suspension is instantly applicable for up to six months and can be easily renewed for up to 18 months through trivial internal government procedures and, after that point, can be renewed indefinitely through slightly more cumbersome internal government procedures. There is no way to appeal or challenge the suspension through the normal course of administrative proceedings. The sole process afforded to a suspended provider is a rebuttal statement, which the Government can essentially ignore without consequence.

59. Put simply, a compliant supplier can have its business devastated based on the inaccurate say-so of a private party that has a vested interest in showing that it is supposedly tough on fraud.

60. This disturbing situation is not hypothetical. It is what has happened to EMSI.

## VII. The Faulty Notice of Suspension and EMSI's Rebuttal

61. As noted above, Qlarant suspended EMSI's Medicare payments on August 13, 2026, including for already provided products and services. *See* Ex. D at 2; Decl. of M. Garcia Jr., ¶¶ 25–27, 34; Decl. of G. Dacey-Zavalianos, ¶¶ 27–28.

62. Notwithstanding this extreme action, Qlarant did not send the Notice identifying the supposed bases for the suspension until August 21, 2026. *See generally* Ex. D.

63. Upon receipt of that Notice, EMSI prepared its 421-page Rebuttal, which it submitted on August 31, 2026, with receipt by Qlarant on September 1, 2026. *See* Ex. E (EMSI Rebuttal); Ex. F (Qlarant Receipt).

64. EMSI's Rebuttal demonstrated that both of the two grounds for suspension cited in the Notice were demonstrably false. *See* Ex. E. To borrow the language of the regulations, there were *no* "credible allegations of fraud" and *no* "indicia of reliability" to support Qlarant's allegations. 42 C.F.R. § 405.370(a).

**a. Refutation of Allegation 1: EMSI Delivered All Billed-For Items, as Demonstrated by Proofs of Delivery.**

65. The Notice's first allegation claimed that EMSI billed Medicare for "item(s) that were never supplied." Ex. D at 3. To support this allegation, the Notice contended that "[f]rom January 2025 and August 2026 [*sic*], CMS received 47 complaints from Medicare beneficiaries who stated that they did not receive the items billed to Medicare." *Id.* No other explanation of these purported complaints was included. However, the Notice listed six Claim Control Numbers ("CCNs"), accompanied by six dates of service, presumably as proof of such complaints.

66. In its Rebuttal, EMSI pointed out that the six CCNs referred to three patients, all of whom had specifically attested to receiving the equipment in question. *See* Ex. E at 4. The Rebuttal included a form showing proof of delivery and acknowledgment for each patient, with each patient's signature. *See id.* (referring to Ex. C of the Rebuttal).

67. All of this equipment had been supplied to the patients as "capped rental items," meaning that patients would rent the equipment for a monthly period and would end up owning the equipment after 13 months of use. *See id.* Remarkably, none of the CCNs or dates identified in Qlarant's Notice referred to the first month of rental, meaning that these were patients who had already received the equipment and had been using it for not less than six months. *See id.* Had Qlarant done even a cursory examination of these records, that would have been obvious.

68. As to the alleged 47 complaints that CMS had received—the substance and dates of which were not included—EMSI pointed out that it had billed 157,700 months of capped rental items for the referenced period of January 2025 until August 2026. *See* Ex. E at 3. Assuming those alleged complaints referred to a specific month of service, that means, even if the complaints were not demonstrably false, that just 0.03% of all EMSI months of rentals had received a complaint over a 20-month period.

**b. Refutation of Allegation 2: EMSI Only Billed for Medically Necessary Items.**

69. The Notice's second allegation was that EMSI had "demonstrated a persistent pattern of improper billing practices." Ex. D at 3. As evidence for this allegation, the Notice cited two things: (1) EMSI "receiving comprehensive education and overpayment notifications on two prior occasions: February 26, 2024; August 08, 2025," along with a listing of five CCNs and dates of service (presumably as evidence); and (2) this opaque statement:

> Claims history indicates that services were likely not medically necessary based on the beneficiaries past medical histories and claim submission

> patterns [*sic*]. For example, 96% of the beneficiaries do not have a medical history that would require the supplies billed to Medicare.

This statement was accompanied by another list of five CCNs and dates of service, with one CCN/date of service overlapping with the list for (1). *Id.* at 3–4. There are no citations or documents referenced in the Notice to explain how the 96% figure was reached.

70. Again, the Rebuttal showed this evidence and the allegation to be demonstrably wrong.

**i. Disputes Over Medical Necessity Are Not Considered "Fraud."**

71. To begin, the Rebuttal observed that disputes over medical necessity are not considered "fraud" in the Medicare context. *See* Ex. E at 8.

72. Section 1862(a)(1) of the Social Security Act contains a lengthy and specific listing of what constitute "items and services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

73. If a Medicare contractor like Qlarant takes the position that certain claims are not medically necessary under the terms of that provision, then the normal course is to deny payment for those claims and for the provider/supplier to appeal the denials through four levels of administrative review, including review by an administrative law judge and by the Medicare Appeals Council.

74. These types of "medical necessity" claims are among the most common of Medicare administrative disputes, and virtually none are considered to involve

"fraud" by the Government. That is because these are disputes over competing good-faith medical judgments, which are best addressed administratively (and at times judicially) with evidence and reference to expert materials.

75. "Fraud" in the Medicare context requires something like an "objective falsehood." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1290 (11th Cir. 2019) (considering False Claims Act in context of Government allegations that medical necessity was absent). That requirement means, consistent with routine Medicare administrative practices, "that a mere difference of opinion between physicians, *without more*, is not enough to show falsity." *Id.* (emphasis in original). Rather, there must be proof that, for example, "a physician did not . . . subjectively believe that his patient [suffered from the relevant illness] at the time of certification." *Id.* at 1297.

76. Defendants have never alleged, much less offered evidence, to suggest anything like this. When a supplier like EMSI submits, in good faith, legitimate claims that are supported by equally legitimate prescriptions by a physician, that is not fraud. It is a claim that should either be paid or resolved through an initial determination of overpayment.

**ii. EMSI Has a Strong Record of Proper Medicare Billing as Shown by its Success in Challenging Claims of Overpayment.**

77. For Allegation 2, the Notice claimed that EMSI "ha[d] demonstrated a persistent pattern of improper billing practices," citing two prior "education and overpayment notifications" from February 26, 2024, and August 8, 2025. Ex. D at 3.

78. In response to this allegation, EMSI produced a much broader set of information about its audit and appeal results.

79. EMSI had been regularly audited under Medicare's Comprehensive Error Rate Testing Program ("CERT"). *See* Ex. E at 5–6. The results of those CERT audits—which the Rebuttal included—showed that, between 2021 and 2026, 95% of EMSI's claims involving the classes of claims listed by the Notice were found to be accurate on initial review, before any appeal by EMSI. *Id.* at 5. (referencing Ex. D of the Rebuttal).

80. Similarly, in 2025, multiple Medicare UPIC contractors had sought review of sixty of EMSI's claims. *See id.* at 6. When administratively challenged, 77% of those claims were found to be properly paid. *See id.* (referencing Ex. E of the Rebuttal). Critically, as to the few remaining claims still in dispute, *the total amount for all those claims came to less than $2,000.00. See id.* EMSI has continued to appeal those claims, some of which are so small in dollar amounts they fall below the threshold for consideration by an Administrative Law Judge.

81. Notably, the Notice makes no reference at all as to either the CERT audits or the successful appeals of UPIC contractors' overpayment determinations.

82. Far from the Notice's allegations, the clear "pattern" is that EMSI bills for lawful and proper claims.

**iii. The Notice Contains Either Faulty or No Information to Support its Claims of Overpayment.**

83. The Rebuttal further pointed out that Allegation 2 rested on erroneous or missing information.

84. The Notice claimed, without any explanation, that 96% of some group of patients it considered did not have medical histories that supported EMSI's billing. Ex. D at 3. That unexplained and unsupported 96% number was contradicted by EMSI's audit and appeal results.

85. Though Qlarant did not provide any of the necessary details, the figure appears to have been the product solely of an automated and inaccurate review of "the *beneficiaries* [sic] past medical histories and claim submission patterns," to use the Notice's language. Ex. D at 3 (emphasis added). But determining medical necessity requires a review of a patient's *actual* medical records. *See* Ex. E at 6. As the Rebuttal explained, "[a] beneficiary's claims history is frequently an incomplete proxy for their actual clinical picture, particularly where relevant care was rendered outside the Medicare claims stream (e.g., inpatient rehabilitation, VA care, private-pay records, or care predating the lookback window used in the contractor's analysis)." *Id.* In fact, when CERT and other claims review contractors had reviewed Qlarant's denials of EMSI's claims, they had overturned them at an unusually high rate, *see id.* at 6–7, indicating that Qlarant's methodology and conclusions were deeply flawed.

86. Even as to the few claims actually identified in the Notice, the Rebuttal included a medical summary for each of the nine identified patient transactions—from the more than 8,000 monthly patient rentals EMSI carries out—showing the specific medical necessity for each equipment claim. *See id.* at 7 (referencing Ex. F of the Rebuttal). Moreover, as described below, EMSI would shortly thereafter submit still more detailed medical summaries, supported by extensive records. *See infra* at ¶¶ 106–108.

87. In sum, Allegation 2 suffered from the same kinds of defects as Allegation 1.

**c. The Rebuttal Explained that Suspension Was Arbitrary, Capricious, and Contrary to Law.**

88. Given that Qlarant's suspension was based on provably incorrect allegations, the Rebuttal made clear that it was unlawful in at least two regards.

89. First, the Rebuttal explained that the allegations not only disregarded the documentary record but also ran counter to it in several respects. *See id.* at 7–8. Such allegations not only lacked credibility, but did not even suffice to show fraud. For that reason, the suspension constituted arbitrary and capricious agency action in violation of the Administrative Procedure Act. *See id.* at 7–8.

90. Second, by depriving EMSI of its property interests in Medicare payments for equipment it had already delivered without following the traditional audit-and-appeal mechanisms used in such circumstances, the suspension constituted a violation of due process. *See id.* at 8–9.

**d. The Rebuttal Makes Clear that EMSI's Suspension Has Badly Injured EMSI and Could Threaten its Continued Existence, While Also Injuring Patients.**

91. Given the importance of Medicare payments to EMSI's business model, the impact of the suspension was immediate. As of the time of the Rebuttal, it "ha[d] already caused thousands of dollars in damages and necessitated furloughs of EMSI's employees." *Id.* at 2. Those damages have only increased in the intervening span. More troublingly, without Medicare payments for months on end, EMSI would be unable to continue operations and could face closure. *See id.*

92. These harms would necessarily impact the thousands of active Medicare beneficiaries that EMSI serves each month. *See id.* If EMSI could not continue operations, these beneficiaries would need to find alternative Medicare-enrolled suppliers capable of meeting their needs. *See id.* Given the specialized nature of EMSI's products, that process would be disruptive and difficult, causing stress, pain, and difficulty to an already vulnerable population. *See id.*

**e. The Rebuttal Seeks Immediate Rescission of the Suspension**

93. Finally, the Rebuttal sought immediate rescission of the suspension. *See id.* at 3, 10.

94. Such rapid action would have been well justified. The Rebuttal had explained that the suspension was based on demonstrably false allegations and thus violated law and EMSI's rights. Other well-established audit and appeal procedures existed for dealing with similar issues, and those procedures would not have imperiled the Company, its employees, and its patients.

### VIII. Qlarant's Cursory Response to the Rebuttal Fails to Address EMSI's Facts and Doubles Down on its Errors.

95. On September 17, 2026, Qlarant delivered a four-page Response to the Rebuttal. *See generally* Ex. G.

96. As to the first allegation, the Response did not challenge or dispute the Rebuttal's conclusive demonstration that all six of the identified patients received their equipment. *See id.* at 2. Instead, it referred to these as "examples only" and again stated that CMS had received 47 complaints (including the six "examples"). *Id.* at 3. The Response provided no details at all regarding the other 41, no means for EMSI to investigate them, and no explanation as to why the remaining 41 would be accurate when the six "examples" were not.

97. As to the second allegation's first claim, the Response simply asserted that EMSI "ha[d] demonstrated a persistent pattern of improper billing practices," with no explanation as to what those practices were. *Id.* It then dismissed the Rebuttal's medical summaries because "there were no clinical notes, standard written orders, or proof of delivery submitted for review." *Id.* Without these, it continued, "CMS [wa]s unable to determine if the items billed were medically necessary." *Id.* Left unexplained was how Qlarant was able to determine that EMSI engaged in billing for medically unnecessary items in the first place given that it could not make that determination with *more* information about each identified patient case.

98. For the second allegation's second claim, the Response again parroted, word-for-word, the Notice's assertion that "[c]laims history indicated that 96% of the

beneficiaries do not have a medical history that would require the supplies billed to Medicare." *Id.* The Response did not provide that "claims history" or any other information. Instead, it copied and pasted its previous response that, even with the medical summaries, "CMS [wa]s unable to determine if the items billed were medically necessary." *Id.* That again begged the question of how Qlarant or CMS could have made such a determination in the first place.

99. The Response also gave generic replies to the Rebuttal's other points. It contended that patients would not be impacted because "CMS's assessment of [EMSI's] geographic area confirm[ed] sufficient alternative suppliers who offer the same services to Medicare beneficiaries," without explaining the assessment or identifying the "alternative suppliers." *Id.* at 4. It asserted that the suspension rested on "adequate indicia of reliability" by simply asserting that such evidence could come "from any source," without describing any such source here. *Id.* And, as to violations of due process, the Response argued that the "suspension d[id] not violate [EMSI's] due process rights" by citing the regulations discussed above. *Id.*

100. The Response concluded that its "determination [wa]s not appealable." *Id.* at 5.

## IX. EMSI Submits Additional Materials.

101. Given the lack of explanation in the Response, EMSI sought more information.

102. On September 23, 2026, counsel and a representative for EMSI wrote to a Qlarant email address seeking "information regarding the remaining 41 beneficiary complaints" that were referenced in the Notice. Ex. H at 3.

103. Later that day, the email address responded that "CMS is not required to reveal all internal processes for implementing a payment suspension." *Id.* at 2.

104. On September 25, 2026, EMSI, through its counsel and representative, reached out to officials at CMS, with whom counsel and the representative had been communicating during this process. EMSI's counsel sought more information regarding the alleged 41 complaints regarding non-delivery of equipment.

105. That same day, Qlarant again emailed counsel for EMSI to reaffirm that it would not provide any information regarding the 41 unidentified complaints. Ex. I.

106. Based on the email exchanges with CMS, on October 1, counsel for EMSI sent a follow-up letter to Qlarant and CMS explaining that the Notice's allegations were false and attaching additional medical summaries, as well as records, for the patients who were alleged to lack medical necessity in a hefty package of information nearly 270 pages long. *See* Ex. J ("Rebuttal Supplement").

107. On October 5, counsel for EMSI sent a further letter and additional medical records to CMS. *See* Ex. K ("Second Rebuttal Supplement").

108. On October 6, CMS indicated that Qlarant would consider these additional medical records and, if they were sufficient, the suspension would be lifted, with Qlarant later confirming that it would undertake the review. *See also* Ex. L (letter from Qlarant to EMSI).

## X. CMS and Qlarant Refuse to Provide any Additional Information or Meaningfully Consider EMSI's Additional Submissions.

109. Through a letter dated October 16, 2026 (but delivered on October 19), Qlarant indicated that neither it nor CMS would remove the suspension. *See* Ex. M.

110. As to Allegation 1 from the Notice, Qlarant simply copied and pasted its prior statement that the six examples that EMSI had rebutted "were provided as examples only" and were "not an exhaustive list." *Id.* at 2. Qlarant again refused to provide any information at all regarding the other 41 alleged instances of non-delivery.

111. As to Allegation 2, Qlarant ignored virtually the entirety of the medical records that EMSI had submitted for the few identified claims. *See id.* at 3. Instead, it simply stated that "office visit notes" did not support one of the particular indications for EMSI's products and then cited a general regulation requiring documentation to establish medical necessity. *See id;* 42 C.F.R. § 410.38(d)(3)(i).. That did not respond to what EMSI provided or even indicate how EMSI could ever furnish documentation sufficient to address Qlarant's purported medical necessity grounds.

112. In a similar fashion, Qlarant again reiterated it would not consider EMSI's strong track record with audits and appeals. *See id.* at 4. Instead, it stated that "the outcome of prior appeals does not provide a basis to terminate the payment suspension as these determinations involved the denial of claims other than those at issue in this investigation." *Id.* Yet Qlarant provided no information about what claims were "at issue in this investigation," leaving EMSI with no way to respond to the allegation.

113. At this point, the Company has tried for weeks to obtain even basic information that would allow it to understand why it has been suspended or how it could even respond to the proffered Allegations. When their allegations were proven wrong, Qlarant and CMS claimed they have other evidence supporting the suspension. When asked for that evidence, they refuse to provide it. At its core, Defendants are playing a game in which they can conceal evidence or move the goal posts on a whim. Such gamesmanship renders the entire suspension process and any purported investigation a sham.

114. Given the grave and deteriorating situation in which EMSI finds itself, the Company has filed the instant suit.

**XI. The Suspension Has Continued to Inflict Acute Harms on EMSI and Soon Those Harms Will be Irreparable.**

115. As the above narrative makes clear, EMSI has sought, without success, to engage both Qlarant and CMS regarding the actual facts behind the Notice's allegations. Instead, Defendants have maintained a suspension based on allegations that are either provably false or intentionally secret. *See* Ex. H at 2 (declining by email to provide purported factual basis because "CMS is not required to reveal all internal processes for implementing a payment suspension").

116. The consequences for EMSI have been devastating and continue to grow. To begin, Defendants are holding onto hundreds of thousands of dollars in payments owed to EMSI for equipment it had *already* delivered prior to the suspension of

reimbursement payments. *See* Decl. of M. Garcia Jr., ¶ 34; Decl. of G. Dacey-Zavalianos, ¶¶ 32–35, Table 1.

117. If EMSI continues to deliver equipment and services as it previously anticipated for the calendar year of August 2025 until July 2026, the suspension will result in deductions totaling over $7,600,000, creating a cumulative loss of nearly $6,400,000. *See* Decl. of G. Dacey-Zavalianos, ¶¶ 32–35. That is plainly unsustainable.

118. Though EMSI has continued to service its existing patients, if the suspension remains in place, it will need to begin to steadily scale back operations and lay off staff. *See* Decl. of M. Garcia Jr., ¶¶ 39–45. EMSI has already furloughed or reduced the hours of 100 of its 270 employees and, more recently, has had to begin terminations as well. *See* Decl. of M. Garcia Jr., ¶ 36; Decl. of G. Dacey-Zavalianos, ¶ 40. Further reductions in operations will prevent EMSI from accepting additional work or continuing with existing clients. *See* Decl. of G. Dacey-Zavalianos, ¶ 45. Though that will reduce the impact of the suspension imposed by Defendants, it will also necessarily depress the Company's revenues even as fixed costs remain in place, creating a vicious cycle of losses. *See id.*

119. The situation is currently at a critical stage. By the end of October of this year, EMSI will have reporting obligations to its bank and will need to formally acknowledge the suspension. *See* Decl. of M. Garcia Jr., ¶ 39. This will very likely trigger default obligations that are beyond what EMSI can afford. *See id.*, ¶ 39.

120. At that stage, EMSI will face impossible options and irreparable injury. Either EMSI will have to cease operations, permanently damaging its financial

standing and reputation, or it will have to seek bankruptcy protection, a permanent change to the status of the Company, including its ownership, operations, and finances, or potentially even liquidation. *See id.*, ¶ 40. The damage would not just be limited to EMSI's Medicare work, but would carry implications for its non-Medicare operations as well, creating a downward spiral. *See id.*, ¶ 41.

121. The damage would not be limited to just EMSI and its ownership. The Company's employees would lose their jobs, harming them and their families. Perhaps most troublingly, the thousands of Medicare beneficiaries who currently rely on EMSI for pain management and rehabilitation would have to find an alternative Medicare-enrolled supplier. Given the specialized nature of EMSI's products and services, that may not be an easy or viable option for many patients. Those beneficiaries will pay a price in terms of time, stress, and physical discomfort.

## STATEMENT OF CLAIMS FOR RELIEF

122. The Declaratory Judgment Act authorizes any court of the United States to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

123. The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

124. The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

125. The APA further provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2).

126. The Federal Mandamus Statute provides that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

127. Defendant Qlarant is an agent of CMS, subject to that agency's supervision and control over its means and methods of conducting its work.

128. Defendants are "agencies" whose final actions are reviewable under the APA.

129. Defendants are "officers or employees of the United States" or "agencies" who can be obligated through mandamus to perform a duty owed to EMSI.

## COUNT ONE

## Violation of Procedural Due Process

## Against All Defendants

130. Plaintiff EMSI incorporates and realleges paragraphs 1 through 129 as if fully stated herein.

131. The Fifth Amendment of the U.S. Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.

132. Plaintiff EMSI has a constitutionally protected property interest in Medicare payments for which it has rendered equipment and services.

133. Defendants' imposition of the suspension constitutes state action. This includes the actions of Qlarant, which has acted as an agent and at the direction of CMS, a government agency.

134. The process afforded to Plaintiff EMSI has been and continues to be constitutionally inadequate under the Fifth Amendment of the U.S. Constitution. Defendants imposed and have maintained the suspension on the basis of allegations that have been proven to be false, have failed to provide any information or details regarding other allegations, have ignored the evidence and documentation proffered by Plaintiff EMSI, and have refused to provide any information to Plaintiff EMSI despite multiple requests.

**COUNT TWO**

**<u>Declaratory Judgment</u>**

**Against All Defendants**

135. Plaintiff EMSI incorporates and realleges paragraphs 1 through 129 as if fully stated herein.

136. As explained above, there is an actual controversy regarding whether Defendants are justified in continuing to suspend Medicare payments to Plaintiff EMSI where there was never good cause or explanation for doing so.

137. Plaintiff EMSI has rebutted Defendants' allegations and reasons for suspending Plaintiff EMSI's Medicare payments and asked Defendants to offer an

explanation or justification for their continued imposition of the payment suspension. The explanation that Defendants have offered is factually wrong, and Defendants have refused to provide any other explanation or evidence to support the suspension.

138. Plaintiff EMSI is entitled to a declaration that Defendants are not justified in continuing to suspend Medicare payments to Plaintiff EMSI.

139. Plaintiff EMSI is also entitled to further necessary or proper relief based on that declaration. 28 U.S.C. § 2202.

## COUNT THREE

### Violation of the Administrative Procedure Act: Action In Excess of Statutory Authority and Otherwise Not in Accordance with Law

### Against All Defendants

140. Plaintiff EMSI incorporates and realleges paragraphs 1 through 129 as if fully stated herein.

141. Pursuant to the APA, the Court must set aside agency action that is not in accordance with law, or that is in excess of statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2).

142. As relevant here, CMS is authorized to suspend payment to a Medicare provider or supplier only "based on credible allegations of fraud." 42 C.F.R. §§ 405.371(a)(2) and 405.372(a)(4).

143. Plaintiff EMSI has shown that all of Defendants' cited examples of "credible allegations of fraud" are inaccurate and run counter to the evidence.

144. Defendants have not identified any other "credible allegations of fraud."

145. Defendants' continued imposition of the payment suspension is therefore outside their statutory authority and otherwise not in accordance with law.

146. Defendants' actions have caused ongoing harm to Plaintiff EMSI, and will continue to cause such harm if the payment suspension is allowed to continue.

**COUNT FOUR**

**Violation of the Administrative Procedure Act:**
**Arbitrary and Capricious Action**

**Against All Defendants**

147. Plaintiff EMSI incorporates and realleges paragraphs 1 through 129 as if fully stated herein.

148. Pursuant to the APA, the Court must set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706.

149. There is no credible allegation of fraud against Plaintiff EMSI.

150. Defendants have provided no explanation for continuing to impose the payment suspension, even though that decision runs counter to the evidence before the agency.

151. Defendants have not demonstrated that they have reviewed the evidence, data, and documents provided by Plaintiff EMSI, and therefore they have entirely failed to consider an important aspect of the problem.

152. Defendants' actions have caused ongoing harm to Plaintiff EMSI, and will continue to cause such harm if the payment suspension is allowed to continue.

## COUNT FIVE

## Mandamus

## Against CMS

153. Plaintiff EMSI incorporates and realleges paragraphs 1 through 90 as if fully stated herein.

154. Plaintiff EMSI is clearly entitled to rescission of the suspension given that no substantiated credible allegations of fraud have been made against it.

155. Defendants have a non-discretionary and clear duty to rescind the suspension. If Defendants have made an initial determination regarding any overpayment by EMSI, they have an obligation to advance such overpayment under normal administrative procedures.

156. Plaintiff EMSI has no other adequate remedy. Plaintiff EMSI has exhausted all other administrative procedures and appeals for rescission of the suspension. Plaintiff EMSI has also sought to communicate directly with Qlarant and CMS regarding the suspension to no avail.

157. Mandamus is appropriate to ensure that Defendants comply with their non-discretionary obligation to rescind Plaintiff EMSI's suspension.

158. Defendants' actions have caused ongoing harm to Plaintiff EMSI, and will continue to cause such harm if the payment suspension is allowed to continue.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EMSI respectfully requests that the Court:

1. Enter final judgment (i) declaring that Defendants were not justified in imposing a payment suspension against Plaintiff EMSI; (ii) ordering Defendants to immediately lift the suspension of Medicare payments to Plaintiff; and (iii) ordering Defendants to proceed through the normal administrative process to adjudicate overpayments for any reimbursement claims that would be subject to such allegations;
2. Award Plaintiff EMSI attorneys' fees and other litigation costs reasonably incurred in this action pursuant to 28 U.S.C. § 2412; and
3. Grant Plaintiff EMSI such other relief as the Court deems just and proper.

Respectfully submitted this 21st day of October, 2026.

**BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ, PC**

*/s/ Marisa R. Dorough*
Marisa R. Dorough (Lead Counsel)
Florida Bar No. 73152
200 South Orange Avenue, Suite 2050
Orlando, Florida 32801
Phone: (407) 422-6600
mdorough@bakerdonelson.com

Stephen M. Azia
DC Bar No. 426575
901 K. Street, N.W., Suite 900
Washington, D.C. 20001
Phone: (202) 508-3400
sazia@bakerdonelson.com
(*Pro hac vice forthcoming*)